AMERICAN EXPRESS FINANCIAL
ADVISORS, INC., Plaintiff,

v.

Stephen H. TOPEL, Defendant.

No. Civ.A. 97–B–1741.

United States District Court,
D. Colorado.

March 9, 1999.

Barbara W. Gall, Maria Luisa Sepulveda, Sherman & Howard, Denver, CO, David E. Schoenfeld, Dawn E. Gard, Grippo & Elden, Chicago, IL, for plaintiff.

Dennis A. Graham, William J. Munn, Clanahan, Tanner, Downing and Knowlton, P.C., Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

In this action arising out of an alleged independent contractor relationship, defendant Stephen H. Topel moves to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted, claim one for breach of contract filed by plaintiff American Express Financial Advisors, Inc. (AMEX). Also pending are the following motions filed by AMEX: 1) Rule 12(b)(6) motion to dismiss Mr. Topel's second and third counterclaims for intentional interference with contractual relations and abuse of process, respectively; and 2) Fed.R.Civ.P. 56 summary judgment motion on claim one for breach of contract, claim five for intentional interference with prospective business relationships, and claim six for breach of fiduciary duty. AMEX seeks summary judgment also on Mr. Topel's counterclaim one for breach of contract, counterclaim two for intentional interference with contractual relations, and counterclaim three for abuse of process. After consideration of the motions, briefs, and arguments, I conclude that summary judgment should be granted in part in favor of AMEX and denied in part. I also deny as moot, AMEX' Rule 12(b)(6) motion to dismiss counterclaims two and three. Further, I deny Mr. Topel's Rule 12(b)(6) motion to dismiss claim one.

### I.

The following facts are undisputed. Mr. Topel, a resident of Lakewood, Colorado, worked as a financial planner for AMEX pursuant to the Planner Agreement entered into by the parties on or about April 29, 1992. Mr. Topel terminated his relationship with AMEX on May 21, 1997, effective May 23, 1997. Facts specific to each motion are set out below.

### II.

#### Claims, Counterclaims, and Pending Motions

| CLAIM NO. | PENDING MOTION | COUNTERCLAIM NO. | PENDING MOTION |
|---|---|---|---|
| ONE—breach of contract | —Topel's Rule 12(b)(6) motion to dismiss <br> —AMEX' Rule 56 summary judgment motion | ONE—breach of contract | AMEX' Rule 56 summary judgment |
| TWO—misappropriation of trade secrets | NONE | TWO—intentional interference with business relationship | —AMEX' Rule 12(b)(6) motion to dismiss <br> —AMEX' Rule 56 summary judgment motion |
| THREE—violation of Lanham Act § 43(a) | NONE | THREE—abuse of process | —AMEX' Rule 12(b)(6) motion to dismiss <br> —AMEX' Rule 56 summary judgment motion |
| FOUR—conversion | NONE | | |
| FIVE—intentional interference with prospective business relationships | AMEX' Rule 56 summary judgment motion | | |
| SIX—breach of fiduciary duty | AMEX' Rule 56 summary judgment motion | | |

## III.

Under Rule 12(b)(6), a district court may dismiss a complaint for failure to state a claim upon which relief can be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). If the plaintiff has pled facts that would support a legally cognizable claim for relief, a motion to dismiss should be denied. *Id.* In reviewing the sufficiency of the complaint, all well-pled facts, as opposed to conclusory allegations, must be taken as true. *Weiszmann v. Kirkland & Ellis*, 732 F.Supp. 1540, 1543 (D.Colo.1990). All reasonable inferences must be liberally construed in the plaintiff's favor. *Id.*

## IV.

A. *Defendant Topel's motion to dismiss AMEX's claim one for breach of contract*

Mr. Topel seeks dismissal of AMEX's claim one for breach of the Planner's Agreement in which AMEX alleges that he willfully breached several covenants in the Planner's Agreement including a noncompetition covenant. C/O ¶ 60; *see also* C/O Ex. D, § IV.1(g). Mr. Topel contends that under Colorado law, the noncompetition covenant is void. Therefore, he is entitled to dismissal of AMEX' claim one for breach of contract. For the following reasons, I will deny the motion.

1. *Facts*

For five years, Mr. Topel worked as a financial planner for AMEX pursuant to a written contract with AMEX. (Planner

Agreement). Mr. Topel received copies of both his Planner Agreement and separate documents setting forth certain key terms of this contract prior to starting work as an agent for AMEX. C/O ¶ 16–17. Mr. Topel signed the Planner Agreement as a condition of his affiliation with AMEX. *Id.* at 54. Pursuant to the Planner Agreement, Mr. Topel received training and what AMEX characterizes as confidential trade secret information, comprised of customer identities, addresses, financial holdings, investment objectives, and buying preferences. *Id.* at 21–22.

The Planner Agreement, which Mr. Topel now seeks to avoid, prohibits him, for a period of one year after resigning from AMEX, from soliciting or selling investments and financial services, directly or indirectly, to those AMEX customers in the territory he served or learned about through AMEX. *See* C/O Ex. D, § IV.I.(g). This provision is one of seven related covenants purporting to protect AMEX trade secrets and confidential information:

**Section IV—Restrictions on Your Activities**

1. "Using Information You Acquire"

(a) You must not, without the written consent of [AMEX], use any information you acquired while this Agreement was in force in a manner adverse to the interests of [AMEX], an Affiliate or an Issuer. You also must not:

(1) Encourage or induce anyone to terminate an agreement with [AMEX], an Affiliate or Issuer without [AMEX'] consent; ...

(4) Encourage or induce any Client to sell, surrender or redeem any Product or Service distributed or offered by [AMEX] or an Affiliate or Issuer without [AMEX'] consent.

(b) All of the above provisions apply while the Agreement is in effect and after it ends.

(c) All [customer] Records and Materials are the property of [AMEX], an Affiliate or an Issuer. All rights to Records and Materials that you prepare or create in connection with the performance of this Agreement are hereby assigned to [AMEX].

(d) You are responsible for the safekeeping of these items. When this agreement ends, all of these items remain [AMEX] property. You must return all of them, ... without demand or compensation.

(e) While this Agreement is in effect and after it ends, you agree that you will not reveal the contents of any [AMEX] property or allow them to be revealed. . . . You will not allow any of this information [names, addresses and Financial information] about Clients or potential Clients to be revealed.

(f) You agree that the identity of Clients and potential Clients is confidential information. For one year after this Agreement ends, you agree not to use any such information in connection with any business in competition with [AMEX] or an Affiliate or Issuer.

(g) For one year after this Agreement ends, you agree that you will not, in the territory where you sought applications for Products or Services under this or any other agreement with [AMEX] or an Affiliate, directly or indirectly offer for sale, sell or seek an application for any Product or Service issued or provided by any company to or from a Client you contacted, dealt with or learned about while you represented [AMEX] or an Affiliate or Issuer or because of that representation. . . .

Planner Agreement, § IV. I (emphasis added).

According to AMEX, after Mr. Topel tendered his resignation in late May 1997, it learned that he was violating the terms of his Planner Agreement and was actively soliciting and diverting the AMEX customers he serviced on its behalf. *See, e.g.,* C/O ¶ 7.

a. *Choice of law*

The Planner Exhibit provides:

This Agreement is a Minnesota contract, governed by Minnesota law.... You agree to the jurisdiction of State of Minnesota courts for determining any controversy in connection with this Agreement.

C/O, Ex. D, Planner Agreement, Sec. VII, 2.

AMEX has not asserted the forum selection clause but relies on the choice of Minnesota law provision in the Planner Agreement. Mr. Topel contends that Colorado law should apply to this dispute, because "the application of Minnesota law would violate the strong public policy of this State to void noncompetition agreements." Mtn. to Dismiss, p. 3. *See Commercial Credit Co. v. Higbee*, 92 Colo. 346, 20 P.2d 543 (Colo.1933); *Dresser Industries, Inc. v. Sandvick*, 732 F.2d 783 (10th Cir.1984) (foreign law will not be enforced if it is contrary to the settled public policy of this state).

Section 8–2–113(2), C.R.S., the State of Colorado's statute addressing noncompetition agreements, provides:

> Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:
>
> (a) Any contract for the purchase and sale of a business or the assets of a business;
>
> (b) Any contract for the protection of trade secrets;
>
> (c) Any contractual provision providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years; and
>
> (d) Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel.

C.R.S. § 8–2–113(2).

■ Colorado courts have consistently recognized the policy of voiding noncompetition agreements, except in the circumstances set out in § 8–2–113(2). *See,*

*Dresser; DBA Enterprises, Inc. v. Findlay*, 923 P.2d 298 (Colo.App.1996). To be enforced, such agreements must fall into one of the statutory exceptions and meet the common law rule of reasonableness.

■ Generally, Colorado enforces contractual choice of law provisions, and follows the Restatement (Second) of Conflict of Laws for Contracts, § 187, in determining the enforceability of these provisions. *Power Motive Corp. v. Mannesmann Demag Corp.*, 617 F.Supp. 1048, 1049–50 (D.Colo.1985); *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau*, 198 Colo. 444, 601 P.2d 1369 (1979). Section 187 of the Restatement provides that the forum state should apply the law chosen by the parties unless (a) there is no reasonable basis for the parties' choice or (b) the application of the law chosen would be contrary to a fundamental policy of a state which has a materially greater interest in the issue. *Power Motive*, 617 F.Supp. at 1049–50.

■ Under this standard, according to AMEX, Minnesota law applies. I agree. There is good reason for the parties' choice of Minnesota law. AMEX's principal place of business is in Minneapolis, Minnesota. C/O ¶ 4. This fact alone provides a sufficient basis for the parties' choice of law. *See* Comment f to § 187 of Restatement (Second) of Conflict of Laws (the law of the state selected in the contract has a substantial relationship to the parties or the contract where the selected state is the principal place of business for one of the parties). Additionally, AMEX maintains facilities in Minnesota for the training of its financial planners, and Mr. Topel attended training sessions there. *Id.* at ¶ 18. Because Minnesota is the center of AMEX' corporate work, it has a strong interest in having its contracts uniformly interpreted under Minnesota law.

Moreover, application of Minnesota law would not be contrary to a fundamental policy of Colorado. As demonstrated above, AMEX' post-termination covenants are concerned with providing protection

for its interests in its confidential and trade secret customer information. Colorado specifically enforces contracts for the protection of trade secrets. § 8-2-113(b). *See* § IV(C)(1), *infra*. Therefore, there is no conflict with Colorado law.

 Colorado courts have enforced similar covenants and, thus, application of Minnesota law, which enforces these covenants, is not contrary to a fundamental Colorado policy. In addition, protection of the parties' expectations is a central policy underlying Colorado's law of contracts. *Pirkey v. Hospital Corp. of America*, 483 F.Supp. 770, 774 (D.Colo.1980), citing *Wood Bros.*, 198 Colo. 444, 601 P.2d 1369 (1979). The choice of law provision contained in the Planner Agreement provides strong evidence of the parties' expectations. These expectations should not be put aside absent some proof that the law selected by the parties clearly contravenes a fundamental policy of the forum state. *Hansen v. GAB Business Servs., Inc.*, 876 P.2d 112, 113 (Colo.App.1994). The fact that the forum state does not recognize a claim or theory of recovery is not a substantial conflict that warrants a court's rejection of a contractually designated choice of law. *Id.; see also Equifax Serv., Inc. v. Hitz*, 905 F.2d 1355, 1360 (10th Cir.1990) (refusing to disregard the contractual choice of Kansas law, despite the fact that California was the employee's state of residence and the place of performance under the contract and the fact that California has a policy against enforcing covenants not to compete).

Defendant's reliance on *Dresser* is misplaced. In *Dresser*, there was no contractual choice of law provision; accordingly, the court applied Colorado law as the result of a balancing of the interests of the interested states. *Id.* at 785-88. Moreover, there was no indication in *Dresser* that the restrictive covenant at issue protected any trade secrets—the employees were "mud engineers" with limited technical training who employed standard tests and calculations to determine the additives necessary to maintain the consistency of

the drilling mud formulated for oil and gas wells. *Id.* at 784. The *Dresser* restrictive covenant prohibited *all* competition with the company in the territories where the employee worked during the previous two years of employment. *Id.* Accordingly, unlike the post-termination covenants at issue here, the purpose of the *Dresser* restrictive covenants was to prevent all competition by former employees, not to prevent the former employee from using trade secrets obtained during the course of performing his or her duties. Because the covenant not to compete did not fall within an exception to the Colorado statute invalidating covenants not to compete, the *Dresser* court found that it was invalid.

Here, the stated purpose of the post-termination covenants is for the protection of trade secrets that fall within an exception to the Colorado statute. Accordingly, at this Rule 12(b)(6) stage, I cannot say that it appears beyond doubt that AMEX can prove no set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson*, 355 U.S. at 45–46, 78 S.Ct. 99. Therefore, I will deny Mr. Topel's motion to dismiss claim one for breach of contract.

I note at this juncture that, except for the enforceability of the section IV restrictions, with respect to the remaining claims and motions at issue here, the parties themselves have looked to Colorado law. Therefore, I will as well.

B. *Plaintiff AMEX' Rule 12(b)(6) motion to dismiss counterclaims two and three and Rule 56 motion for summary judgment on counterclaims one, two, and three*

On September 21, 1998, pursuant to the adoption of a magistrate judge's recommendation, Mr. Topel was granted leave to file the following counterclaims: 1) breach of contract; 2) intentional interference with business relationships; and 3) abuse of process. Now pending is AMEX's Fed. R.Civ.P. 12(b)(6) motion to dismiss counterclaims two and three for failure to state

a claim upon which relief may be granted and a Rule 56 summary judgement motion on counterclaims one, two, and three.

Fed.R.Civ.P. 12(b) provides that if matters outside the complaint are presented to and not excluded by the court, it should treat the motion to dismiss as a summary judgment motion. Fed.R.Civ.P. 12(b); *Carter v. Stanton*, 405 U.S. 669, 671, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); *Foremaster v. City of St. George*, 882 F.2d 1485, 1491 (10th Cir.1989). The failure to convert a motion to dismiss so postured to a motion for summary judgment under Fed.R.Civ.P. 56 where a court does not exclude outside materials is reversible error unless the dismissal can be justified without considering the outside materials. *See Brown v. Zavaras*, 63 F.3d 967, 970 (10th Cir.1995). Where, as here, the party seeking Rule 12 dismissal files a Rule 56 motion addressing the same counterclaims, I deny, as moot, the motion to dismiss. Hence, I address the counterclaims in the context of the Rule 56 motion.

The very purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). Fed. R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judg-

ment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir.1980); Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Mares*, 971 F.2d at 494. Unsupported allegations without "any significant probative evidence tending to support the complaint" are insufficient, *see White* at 360 (internal quote and citation omitted), as are conclusory assertions that factual disputes exist. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505.

1. *counterclaim one for breach of contract*

AMEX moves for summary judgment on Mr. Topel's first counterclaim for breach of contract based on allegations that AMEX breached the parties' Planner Agreement by treating him like an independent contractor when he was, in fact, an employee.

 The determination of whether an individual is an employee or an independent contractor is a question of fact. *Hockett v. Sun Co., Inc.*, 109 F.3d 1515,

1525–26 (10th Cir.1997). In making this determination under the general common law of agency, courts evaluate all factors relevant to the hiring party's right to control the manner and means by which the product is accomplished. *Id.* at 1526. These factors include (a) the source of the instrumentalities and tools for the person doing the work; (b) the location of the work; (c) duration of the work relationship; (d) the hiring party's right to assign additional duties to the hired party; (e) whether the work is a part of the regular business of the hiring party; (f) whether the hiring party is or is not in business; and (g) the intent of the parties. *Id.*

■ In support of its position that Mr. Topel was an independent contractor, AMEX relies upon the undisputed language in the Planner Agreement stating that Mr. Topel is an independent contractor and not an employee. In opposition, Mr. Topel submits evidence that: (a) AMEX required Mr. Topel to work full time for AMEX only; (b) AMEX required Mr. Topel to sell specified products only; (c) AMEX attempted to require Mr. Topel's presence at meetings where AMEX would instruct planners on the approved method of operating, the dress code, and planner conduct; (d) a continuing relationship of more than five years existed between Mr. Topel and AMEX; (e) Mr. Topel was required to regularly report to AMEX; (f) AMEX maintained the right under Section VI of its Planner Agreement to terminate Mr. Topel's independent contractor relationship at any time for certain reasons, or for no reason at all; and (g) AMEX has claimed that Mr. Topel could not continue to service the customers he had been working with for years. *See* Resp. Brief Ex. A, Topel Aff., ¶ 9; Resp. Brief Ex. B, Topel Depo., p. 41

In addition, Mr. Topel provides evidence that AMEX provided him with the tools for his work, including necessary computer financial software, required that the location of his office be approved by AMEX, and had the right to assign additional duties and customers to Mr. Topel. Mr.

Topel's financial planning and services work was part of the regular business of AMEX and AMEX is undeniably in the business of financial planning and services. *See* Resp. Brief Ex. A, ¶ 10.

Based on the above evidence, there exists a material factual dispute about whether Mr. Topel was an independent contractor or an employee of AMEX. Although oral argument demonstrated questionable basis for other than nominal damages, I cannot grant summary judgment on that basis. Hence, I deny AMEX' summary judgment motion on counterclaim one for breach of contract. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

2. *Mr. Topel's counterclaim two for intentional interference with business relationships*

In counterclaim two, Mr. Topel alleges that: 1) he had contracts with his customers; 2) that AMEX knew of these contracts, or had knowledge of other facts which reasonably should have cause AMEX to know of the contracts; and 3) AMEX intentionally induced or attempted to induce Mr. Topel's customers to terminate their contracts with him. Second Counterclaim, ¶¶ 30–32.

■ Colorado has adopted the test for intentional interference with existing contractual relations set forth in the Restatement (Second) of Torts, § 766:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*See Q.E.R., Inc. v. Hickerson,* 880 F.2d 1178, 1183 (10th Cir.1989); *Memorial Gardens v. Olympian Sales & Management Consultants, Inc.,* 690 P.2d 207, 210 (Colo. 1984). To succeed on his claim for inten-

tional interference with existing contractual relations, Mr. Topel must submit evidence that he had a valid contract with a customer. See *Fasing v. LaFond,* 944 P.2d 608, 612–13 (Colo.App.1997); *Grimm Const. Co. v. Denver Bd. of Water Commissioners,* 835 P.2d 599, 601 (Colo.App. 1992). Next, he must show that AMEX intentionally and improperly interfered with that contract, causing the customer not to perform the contract, and causing Mr. Topel to suffer damages as a result. *See Q.E.R.,* 880 F.2d at 1183; *Memorial Gardens,* 690 P.2d at 210.

■ At his deposition, Mr. Topel admitted that he had no contracts with the customers he currently services, nor were there contracts between him and the customers he serviced as an AMEX financial planner. Ex. 2, Topel Dep., pp. 43, 156–57. The lack of any such contracts is fatal to Mr. Topel's counterclaim for interference with contractual relations—there can be no tortious interference with existing contractual relations unless there is a contract in the first place. Accordingly, I will grant AMEX' summary judgment motion on counterclaim two based on existing contractual relations.

### 3. *Mr. Topel's counterclaim three for abuse of process*

■ The elements for an abuse of process claim are: (1) an ulterior motive in the use of judicial proceedings; (2) willful actions by a party in the use of the process which are not proper in the regular conduct of a civil action; and (3) damages caused by (1) and (2). *Moothart v. Bell,* 21 F.3d 1499, 1508 (10th Cir.1994), *citing Swanson v. Bixler,* 750 F.2d 810, 814 (10th Cir.1984). Mr. Topel claims that AMEX filed this suit for the ulterior and primary purpose of harassing and intimidating him and intimidating other financial planners in an effort to prevent such planners from leaving AMEX.

In support of his allegations concerning AMEX' motives in filing this suit, Mr. Topel submits his affidavit in which he restates his allegations concerning AMEX's motives. Resp.Ex. A, ¶ 15. Such conclusory allegations not supported by specific facts cannot defeat a properly supported motion for summary judgment. *Murray v. City of Sapulpa,* 45 F.3d 1417, 1422 (10th Cir.1995) ("conclusory and self-serving affidavits are not sufficient" to defeat summary judgment), *quoting Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir. 1991); *Nichols v. Hurley,* 921 F.2d 1101, 1113 (10th Cir.1990) ("conclusory allegations without specific supporting facts have no probative value"). The evidence introduced by Mr. Topel on abuse of process is neither "significantly probative," nor "merely colorable;" accordingly, there is no genuine issue of material fact. *Handy v. Price,* 996 F.2d 1064, 1066 (10th Cir.1993); *Hall,* 935 F.2d at 1111. Because the record taken as a whole could not lead a rational trier of fact to find that AMEX abused process by filing this lawsuit, there is no genuine issue for trial. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Handy,* 996 F.2d at 1066; *Hall,* 935 F.2d at 1111.

Mr. Topel admits that he signed the Planner Agreement. Ex. 2, Topel Depo., p. 26. That agreement contains restrictions on the services Mr. Topel could provide to the AMEX customers he serviced on its behalf. *See* Ex. 1, § IV. The Planner Agreement contains a provision whereby Mr. Topel agreed that AMEX could seek the Court's assistance in enforcing the Agreement. *Id.* at § IV(3)(a). Where, as here, AMEX has filed suit pursuant to § IV(3)(a), as a matter of law there is no abuse of process.

In the alternative, Mr. Topel has not alleged or submitted evidence of any willful actions by AMEX in the conduct of this litigation that are not proper in regular civil litigation. Although Mr. Topel stated at his deposition that he believes Charles Wachendorfer, his former Group Vice President, has a "vendetta" against him, Ex. 2, Topel Depo., pp. 162–63, this is not sufficient to withstand a summary judgment motion.

Contrary to Mr. Topel's contentions, AMEX has not used this lawsuit to accomplish some coercive goal that is not the intended legal purpose of the lawsuit. Through this lawsuit, AMEX seeks to recover damages for Mr. Topel's misappropriation of trade secrets, breach of contract, breach of fiduciary duty, intentional interference with prospective contractual relations, conversion, and violations of the Lanham Act. Mr. Topel has not alleged any specific facts or introduced any evidence suggesting that AMEX has acted inconsistent with this purpose.

This point is illustrated in *James H. Moore & Associates Realty, Inc. v. Arrowhead at Vail,* 892 P.2d 367 (Colo.App.1994). The *Moore* court held that the filing of a lis pendens notice was not undertaken in an improper manner where it could not be shown that there was an improper use of the process. *Id.* at 373. The Court noted:

> If the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint there is no abuse, even if the plaintiff had an ulterior motive in bringing the action or if he knowingly brought suit upon an unfounded claim. Furthermore, *while the ulterior motive may be inferred from the wrongful use of the process, the wrongfulness may not be inferred from the motive.*

*Id.,* quoting *Institute for Professional Development v. Regis College,* 536 F.Supp. 632, 635 (D.Colo.1982) (emphasis added); *accord* Restatement (Second) of Torts, § 682 comment b ("[t]here is no action for abuse of process when the process is used for the purpose for which it is intended, [although] there is an incidental motive of spite or an ulterior purpose"). Thus, in *Moore,* the court concluded that there had been no abuse of process despite its finding that the claimant had improper motives at some point during the case. Accordingly, even if I assume that AMEX had some ulterior motive in bringing this lawsuit, this counterclaim must fail because Mr. Topel has failed to allege or introduce any evidence to support his claim that AMEX used this process im-

properly. *See Celotex,* 477 U.S. at 425, 106 S.Ct. 2548; *Universal Money Centers, Inc. v. American Telephone and Telegraph Co.,* 22 F.3d 1527, 1529 (10th Cir.1994). Consequently, I grant AMEX' summary judgment motion on Mr. Topel's third counterclaim for abuse of process.

C. *Plaintiff AMEX' Rule 56 summary judgment motion on claims one, five, and six*

1. *Claim one for breach of contract*

AMEX seeks summary judgment on its claim one for breach of contract based on admissions made by Mr. Topel in his deposition that during the one year period after he terminated his contract with AMEX he continued to provide financial services to customers he worked with at AMEX. Ex. 2, Topel Depo., p. 172.

In opposition, Mr. Topel argues, as an initial matter, that the noncompetition covenant is unenforceable. Based on my conclusions in section IV(A)(1)(a), I look to Minnesota law in evaluating the validity of this clause. In Minnesota, restrictive covenants such as contained in the Planner Agreement are "a partial restraint on trade and thus are disfavored by Minnesota...." *IDS Life Ins. v. SunAmerica, Inc.,* 958 F.Supp. 1258, 1273 (N.D.Ill. 1997), *vacated in part on other grounds,* 136 F.3d 537 (7th Cir.1998). "They are only enforced if and to the extent that they are reasonably necessary to safeguard a protectable interest of the employer and do not impose unnecessary hardship on the employee's livelihood." *Id.* One protectable interest is protection of a trade secret. *See Roth v. Gamble–Skogmo, Inc.,* 532 F.Supp. 1029 (D.Minn.1982). If no trade secret is found, a bare covenant not to compete will not be enforced under Minnesota law. *IBM Corp. v. Seagate Technology, Inc.,* 941 F.Supp. 98, 100 (D.Minn. 1992).

Minnesota's Uniform Trade Secrets Act (UTSA), Minn.Stat. § 325C.01, subd. 5, provides:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn.Stat. § 325C.01, subd. 5.

The Planner Agreement provides that "[the financial planner] understand[s] and agree[s] that information about Clients, including Client identities, is confidential information and a trade secret." Ex. D, § III, ¶ 4(f). Mr. Topel defines the "trade secret" in this case as the client identities which are not protectable as "trade secrets." This definition is over-narrow and constricted. The information AMEX seeks to keep secret is the customer identities *in conjunction with* financial information including the customer's investment risk tolerance, financial goals, and specific portfolio information.

Under Minnesota's UTSA, customer names and investment characteristics are viewed as trade secrets. *See IDS,* 958 F.Supp. at 1279. Moreover, AMEX' use of the Planner Agreement containing the financial planners' obligations and limitations with respect to the use of this information is, as a matter of law, "efforts that are reasonable under the circumstances to maintain its secrecy." Minn.Stat. § 325C.01, subd. 5(ii). Consequently, the pertinent provisions of AMEX' Planner Agreement protect legitimate trade secrets.

Next, I examine whether the Planner Agreement's noncompetition covenant imposes unnecessary hardship on Mr. Topel's livelihood. *See IDS,* 958 F.Supp. at 1273.

In affirming in part, the Seventh Circuit stated that the district court's holding that the restrictive covenant, identical to the one in this case, of "only one year—and one that barred contacts with actual clients rather than excluding the covenantor from an entire line of business—requires little proof of justification and indeed could be thought presumptively reasonable." *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.,* 136 F.3d 537 (7th Cir.1998). In a similar case involving an individual defendant, the District Court preliminarily enjoined an individual planner from selling products or services to the IDS customers that he had been serving as an IDS representative. *IDS Financial Servs., Inc. v. Smithson,* 843 F.Supp. 415, 418–19 (N.D.Ill.1994). Pursuant to Minnesota law, the noncompetition covenant contained in the Planner Agreement, protects a legitimate trade secret and is reasonable in scope and duration. Hence, it is enforceable.

As to the substantive merits of AMEX' summary judgment motion on claim one for breach of contract, it is undisputed that during the one-year period following the date Mr. Topel left AMEX, May 23, 1997 through May 23, 1998, he provided financial planning services for former AMEX customers. Ex. 2, p. 172. There is no genuine dispute that Mr. Topel violated the Planner Agreement § IV.1(g).

In addition, AMEX states it is entitled to summary judgment on claim one based on undisputed evidence that Mr. Topel breached other provisions of the Planner Agreement. Mr. Topel's deposition testimony showed that in many cases, Mr. Topel encouraged and/or facilitated the sale, surrender, or redemption of his customers' AMEX products, thereby violating Planner Agreement, § IV.I(a)(1) and (4). *See* Ex. 2, Topel Depo., pp. 116–17; Ex. 10, J. Hemming Depo., pp. 12, 14–15, 17–18, 27; Ex. 11, Rogers Depo., pp. 10–21, 23, 25–28; Ex. 12; Ex. 13; N. Hemming Depo., pp. 10–12; Ex. 15, Matson Depo., pp. 8–11, 15, 18–19. Because the evidence is undisputed that Mr. Topel has violated §§ IV.I(a)(1) and (4) and (g) of the Planner Agreement, AMEX is entitled to summary

judgment on its claim for breach of contract.

### 2. *AMEX' claim five for intentional interference with prospective business relations*

AMEX states it is entitled to summary judgment on its claim five for intentional interference with prospective contractual relations because Mr. Topel has admittedly interfered with AMEX' contractual relationships with its customers, in direct violation of numerous provisions of his Planner Agreement.

#### a. *Facts*

Mr. Topel's customers testified that he contacted them while he was still affiliated with AMEX in an attempt to solicit their business on behalf of his new broker/dealer, Multi–Financial Securities Corporation. For example, customer James Hemming testified that Mr. Topel first contacted him in January 1997 to solicit his business for Mr. Topel's new venture. *See* Ex. 10, J. Hemming Depo., p. 12. Mr. Hemming testified that he wanted to stay with AMEX and asked Mr. Topel on at least two occasions how he could stay with AMEX. *Id.* at pp. 14–15, 17–18. Mr. Hemming testified that Mr. Topel "just blew right past" and "never honored" his requests to stay with AMEX. *Id.* at 17–18. Mr. Hemming stated he went along with it because he "didn't want to press any issues with [Mr. Topel]." *Id.* at 14–15. He explained that "when someone has access to anything I consider valuable, I don't want to cause any undue concern or aggravation." *Id.* at 15. Mr. Hemming moved the full amount of his investments from AMEX to Mr. Topel's new venture. *Id.* Mr. Hemming liquidated his AMEX accounts on May 12, 1997, nine days before Mr. Topel announced his resignation from AMEX. *Id.* at 18.

Similarly, customer Amy Rogers testified that in April 1997, while Mr. Topel was still affiliated with AMEX, he recommended that she and her husband invest in non-AMEX products. Ex. 11, Rogers Depo., pp. 10–16, 25–26. The Rogers took Topel's advice and moved their funds out of AMEX. *Id.* at 27. Ms. Rogers testified that Mr. Topel urged her and her husband to invest their funds with certain companies without fully advising them of his plans to leave AMEX. *Id.* at 12–15, 17. Ms. Rogers testified that their funds were transferred "before we really knew that he was leaving [AMEX]." *Id.* at 15; *see also* p. 17 ("we had already made the decision [to invest funds with other companies] before we found out [Mr. Topel was leaving AMEX]").

Ms. Rogers testified that, in reliance on Mr. Topel's advice, she and her husband sold a municipal bond they had previously held to invest in non-AMEX products. *Id.* at 27–28; *see also* Ex. 12, Transaction Receipt. This transaction was completed on May 7, 1997, two weeks before Mr. Topel announced his resignation from AMEX. *Id.* Ms. Rogers further testified that she and her husband signed all of the paperwork to invest in the non-AMEX products Mr. Topel had recommended on May 14, 1997, a week before he announced his resignation. Ex. 11, Rogers Depo. at 17–19, 23, 26.

The evidence shows that on May 12, 1997, nine days before giving notice of his termination, Mr. Topel sent a letter on AMEX letterhead to Chris and Teresa Mammel, two of his AMEX customers. *See* Ex. 13, May 12, 1997 Letter from Stephen Topel to Chris and Teresa Mammel. In the letter, Mr. Topel states that the Mammels "will have to transfer … accounts … out of AMEX into another family of funds…. *Id.*" The letter indicates that Mr. Topel had previously made the Mammels aware of his decision to leave AMEX. *Id.* In the letter, Mr. Topel states that AMEX will not allow its products to be brokered and that it was therefore necessary for the Mammels to liquidate their investments with AMEX. *Id.*

#### b. Law

■ To prevail on a claim for intentional interference with prospective con-

tractual relations, AMEX must submit evidence: 1) of a valid contract with a customer; 2) that Mr. Topel intentionally and improperly interfered with that contract which caused the customer not to perform the contract; and 3) that AMEX suffered damages as a result of Mr. Topel's actions. *See Fasing,* 944 P.2d at 612–13; *Grimm,* 835 P.2d at 601. *See also, Q.E.R.,* 880 F.2d at 1183; *Memorial Gardens,* 690 P.2d at 210.

■ Colorado law permits certain business competition, including interference with existing or prospective business relations, when the nature of the relationship that is being interfered with is at will. If, however, a competitor employs wrongful means to interfere with a contractual relationship, the competition is unlawful. *See* Restatement (Second) of Torts, § 768; *Memorial Gardens,* 690 P.2d at 210–11.

It is undisputed that AMEX is a competitor of Mr. Topel. AMEX also concedes that its financial services contracts with customers are terminable at will. *See* SJ Motion, p. 15 n. 5. Mr. Topel accordingly could not have tortiously interfered with the at will contracts of AMEX, a competitor, as a matter of law except in limited situations. *See id.* Such exception applies here.

■ Mr. Topel states that, in and of itself, a breach of the Planner Agreement does not make such conduct "wrongful." Citing Black's Law Dictionary, according to Mr. Topel, "wrongful" means an act done in a tortious or criminal manner, not in breach of a simple contract. *See Black's Law Dictionary* 829 (5th Ed.1983). However, according to Black's Law Dictionary, "wrongful act" includes "[a]ny act which in the ordinary course will infringe upon the rights of another to his damage...." *Black's Law Dictionary* 1612 (6th Ed.1990). Also, "wrongful conduct" is defined as "[c]onduct which contravenes some duty which law attaches to relation between parties affected." *Id.*

To create a genuine issue of material fact on this issue, Mr. Topel must set forth specific facts that rebut the detailed testimony of his customers and the documents that evidence his pre-termination solicitation. Self-serving, conclusory statements will not discharge this burden. *See Murray,* 45 F.3d at 1422 (to survive summary judgment, " 'nonmovant's affidavits must be based on personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient' "), *quoting Hall,* 935 F.2d at 1111; *Nichols,* 921 F.2d at 1113 ("conclusory allegations without specific supporting facts have no probative value"). If the evidence introduced by the nonmovant is "merely colorable," or anything short of "significantly probative," a genuine issue of material fact will not be found. *Handy,* 996 F.2d at 1066; *Hall,* 935 F.2d at 1111. Unless the record taken as a whole could lead a rational trier of fact to find that Mr. Topel did not solicit customers prior to his termination, there is no genuine issue for trial. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Handy,* 996 F.2d at 1066; *Hall,* 935 F.2d at 1111.

In his affidavit, Mr. Topel states:

> Prior to ending my affiliation with AMEX, I never solicited any of my clients, including James and Nancy Hemming and Ms. Rogers, to leave AMEX so that I could continue to be their financial planner. I scrupulously and consciously avoided soliciting my clients to continue with me before I left AMEX. Before ending my association with AMEX, I sent a letter to all of my clients in which I advised them that I was ending my relationship with AMEX, and that the customers['] account would be reassigned to another AMEX advisor.

Ex. A, Topel Affidavit, ¶ 13; Ex. E. However, Mr. Topel has not specifically rebutted the testimony or documents introduced by AMEX. His affidavit merely repeats his claim that he "scrupulously and conscientiously avoided soliciting his clients," including the Hemmings and Ms. Rogers. At his deposition, Mr. Topel claimed that James Hemming was mistaken about when he met with him. He did not, however,

proffer any evidence to demonstrate that Mr. Hemming was mistaken. Indeed, he failed to offer any specific contrary evidence to counter the testimony of Mr. Hemming or Ms. Rogers.

Because Mr. Topel has offered nothing more than a general conclusory denial to address the specific evidence AMEX has introduced regarding his solicitation of AMEX customers, he has failed to create a genuine issue of material fact so as to defeat AMEX' summary judgment on claim five.

3. *AMEX' motion for summary judgment on its claim six for breach of fiduciary duty*

 Colorado law provides that " '[u]nless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with the agency.' " *Jet Courier Serv., Inc. v. Mulei,* 771 P.2d 486, 492 (Colo.1989) *quoting* Restatement (Second) of Agency, § 387. While an agent is entitled to make some preparations to compete with his principal after the termination of their relationship, an agent violates his duty of loyalty if he engages in pre-termination solicitation of customers for a new competing business. *Jet Courier,* 771 P.2d at 493–94, citing Restatement (Second) of Agency, § 393, comment e; *see also Koontz v. Rosener,* 787 P.2d 192, 195–96 (Colo.App.1989) (by working to set up competing business while still engaged by plaintiff, defendants violated their duty of loyalty); *Community Counselling Serv., Inc. v. Reilly,* 317 F.2d 239, 244 (4th Cir. 1963) (during period of employment, employee cannot solicit for himself future business which his employer requires him to solicit for his employer; moreover, "[i]f prospective customers undertake the opening of negotiations which the employee could not initiate, he must decline to participate in them").

 As the undisputed facts make clear, Mr. Topel solicited customers for his new venture while he was still affiliated with AMEX. *See* Ex. 10, J. Hemming

Depo., pp. 14–15, 17–18; Ex. 11, Rogers Depo., pp. 10–19, 23, 25–28; Ex. 12; Ex. 13. In some instances, there is evidence that Mr. Topel ignored his AMEX customers' requests to keep their investments with AMEX. Ex. 10, J. Hemming Depo., pp. at 14–15, 17–18. He also sent correspondence to his AMEX customers to solicit them for his new venture while he was still employed by AMEX and, in at least one instance, on AMEX letterhead. *Id.* at 14–16; Ex. 13; Ex. 14, N. Hemming Depo., pp. 10–12. There is no genuine issue regarding whether Mr. Topel's activities violated his fiduciary duty of loyalty to AMEX. Therefore, AMEX is entitled to summary judgment on this claim.

Mr. Topel has not challenged AMEX' statement of the law on this issue; nor has he successfully challenged the facts upon which AMEX relies. Although Mr. Topel contends that "no single issue is more hotly and directly contested or factually sensitive" than this issue, Mr. Topel has not met his burden in opposing summary judgment. It is not enough for Mr. Topel to maintain that this issue is contested; as the non-moving party, he is required to come forward with specific evidence to rebut the extensive evidence submitted by AMEX on breach of fiduciary duty. *See United States v. Simons,* 129 F.3d 1386, 1388–89 (10th Cir.1997) (to successfully oppose a properly supported motion for summary judgment, " 'sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein' ") (citation omitted); *see also Handy,* 996 F.2d at 1066 (a genuine issue of fact will not be found if evidence introduced by non-movant is anything short of "significantly probative"); *Hall,* 935 F.2d at 1111. This he has failed to do.

Mr. Topel ignores the specific testimony of the Hemmings, Ms. Rogers, and Mr. Matson that he solicited their business for Multi–Financial while he was still affiliated with AMEX. He offers no explanation for

the letter he wrote to the Mammels prior to his termination on AMEX letterhead soliciting the Mammels' business for Multi-Financial. Mr. Topel likewise makes no mention of the Multi-Financial new account forms and related documents that predate his departure from AMEX and/or have the dates crossed out. *See* Ex. 9. In light of the overwhelming evidence that Mr. Topel breached his fiduciary duty to AMEX, his conclusory affidavit and deposition testimony fails to create a genuine issue of material fact. *Murray*, 45 F.3d at 1422 ("conclusory and self-serving affidavits are not sufficient" to defeat summary judgment), *quoting Hall*, 935 F.2d at 1111; *Nichols*, 921 F.2d at 1113 ("conclusory allegations without specific supporting facts have no probative value").

Nor does Mr. Topel create a genuine issue of material fact by offering the testimony of one customer, Theodore Benavidez, whose unrebutted testimony is that Mr. Topel did not solicit his business until after he left AMEX. *See* Response Brief at p. 17. Mr. Benavidez' testimony does not negate the testimony of other customers who testified that Mr. Topel solicited their business for Multi-Financial while he was still affiliated with AMEX. Furthermore, even if Mr. Topel sent a neutral letter regarding his resignation to the AMEX clients he serviced on its behalf, *id.* at 16, it does not follow that no solicitation occurred prior to that letter. In fact, many customers had already signed new account forms with Multi-Financial by the time this neutral letter was purportedly sent. *See* Ex. 9. Thus, that it is genuinely disputed whether Mr. Topel solicited improperly some of his customers is irrelevant when is undisputed that he improperly solicited the Hammonds, Ms. Rogers, and Mr. Matson before he terminated his employment with AMEX. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 ("[f]actual disputes that are irrelevant or unnecessary will not be counted in considering a motion for summary judgment"). Mr. Topel has not met his burden in opposing summary judgment on this issue. Therefore, I grant AMEX' summary judgment motion on its claim six for breach of fiduciary duty.

### V.

#### Conclusion

Based on the foregoing, AMEX' claims remaining for trial are: a) claim two for misappropriation of trade secrets; b) claim three for violation of the Lanham Act § 43(a); and c) claim four for conversion. Counterclaim one for breach of contract is Mr. Topel's only remaining counterclaim. Also remaining for trial is the determination of damages to be awarded AMEX on its claims one (breach of contract), five (intentional interference with prospective business relationships), and six (breach of fiduciary duty).

Accordingly, IT IS ORDERED that:

1. defendant's Fed.R.Civ.P. 12(b)(6) motion to dismiss is DENIED as to claim one for breach of contract;

2. plaintiff's Fed.R.Civ.P. 12(b)(6) motion to dismiss counterclaims two and three is DENIED as moot; and

3. plaintiff's Fed.R.Civ.P. 56 motion for summary judgment is: a) DENIED as to counterclaim one for breach of contract; b) GRANTED as to counterclaim two for intentional interference with business relationship; c) GRANTED as to counterclaim three for abuse of process.

Further, IT IS ORDERED that:

4. plaintiff's Fed.R.Civ.P. 56 motion for summary judgment is: a) GRANTED as to liability upon claim one for breach of contract; b) GRANTED as to liability upon claim five for intentional interference with prospective business relationships; and c) GRANTED as to liability upon claim six for breach of fiduciary duty.